## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **Dr. A., NURSE A., DR. C., NURSE D., DR. F., DR. I., THERAPIST I., NURSE J., DR. M., NURSE M., NURSE N., DR. O., DR. P., TECHNOLOGIST P., DR. S., NURSE S.** and **PHYSICIAN LIAISON X.**, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.    1:21-cv-01009 |
| **KATHY HOCHUL**, Governor of the State of New York, in her official capacity; **HOWARD A. ZUCKER**, Commissioner of the New York State Department of Health, in his official capacity; and **LETITIA JAMES**, Attorney General of the State of New York, in her official capacity, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION,
## WITH LEAVE TO PROCEED UNDER PSEUDONYMS.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

  I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE
VACCINE MANDATE PLAINLY VIOLATES FEDERAL LAW ................................. 3

    A.   The Vaccine Mandate Is Clearly Preempted by Title VII Federal Employment Law.... 3

    B.   The Vaccine Mandate Violates the Free Exercise Clause of the First Amendment. ...... 7

       1.    The Vaccine is not a neutral, generally applicable burden on religious exercise. .... 7

       2.    The Vaccine Mandate easily fails strict scrutiny. .................................................... 10

    C.   The Vaccine Mandate Also Violates the Equal Protection Clause ............................. 14

  II.   PLAINTIFFS SATISFY THE REMAINING FACTORS FOR A TRO AND PI............ 15

  III.  PLAINTIFFS SATISFY THE STANDARD FOR PROCEEDING UNDER
PSEUDONYMS ........................................................................................................ 17

  IV.  IN THE EVENT THESE MOTIONS ARE DENIED, PLAINTIFFS SHOULD BE
GRANTED AN INJUNCTION PENDING APPEAL. ................................................... 18

CONCLUSION............................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Agudath Israel v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ...................................... 12

*Arizona v. U.S.*, 567 U.S. 387, 398 (2012) ................................................................ 4

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) ............................. 3

*Cent. Rabbinical Cong. of U.S. & Canada*, 763 F.3d 183, 193, 194-95 (2d Cir. 2014)................ 7

*Chestnut Hill NY, Inc. v. City of Kingston*, No. 117-cv-0095, 2017 WL 11418271, at *1
    (N.D.N.Y. Feb. 22, 2017) ........................................................................... 2

*Chicago & N.W. Transp. Co. v. Kalo Brick Tile Co.*, 450 U.S. 311, 317 (1981) .......................... 4

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993)................ 8

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012)................ 7

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) ................................. 5

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................ 15

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2001) ........................... 10

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) ...................................... 4

*Hayden v. Paterson*, 594 F.3d 150, 169-70 (2d Cir. 2010).............................................. 14

*Haywood v. Drown*, 556 U.S. 729, 734 (2009).......................................................... 4

*In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 1987)....................... 18

*Kwong v. Bloomberg*, 723 F.3d 160, 170 (2d Cir. 2013)................................................ 14

*Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021)........................... 12, 13

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)........................... 16

*Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ............................................. 15, 16

*Romer v. Evans*, 517 U.S. 620, 633 (1996).............................................................. 14

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008).................................. 17

*Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713
    (5th Cir. 1979)........................................................................................ 18

*Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021)......................................... 7, 8

*Thomas v. Review Bd. of Indiana Emp. Security Div.*, 450 U.S. 707, 718 (1981)....................... 10

*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019)................................. 4

## Statutes

10-144 C.M.R. Ch. 264 (2021)......................................................................... 13

22 M.R.S. § 802 (4-B) ................................................................................ 13

42 U.S.C. § 2000e-2(a)(1)............................................................................... 5

42 U.S.C. § 2000e-7.................................................................................... 6

42 U.S.C. § 2000e(j) ................................................................................... 5

42 U.S.C. § 2000e-2(a)(2)............................................................................... 5

## INTRODUCTION

The seventeen plaintiffs in this action are medical professionals from all four judicial districts of this Court: doctors, nurses, a therapist, a medical technologist and a physician liaison. For almost eighteen months, the medical practitioners among them were part of the endlessly praised "front line" in the "battle against COVID." Today, they are pariahs, imminently at risk of professional destruction, loss of livelihood and reduction to second-class citizenship because they cannot in conscience, given their sincere religious beliefs, consent to be injected with vaccines that were tested, developed or produced with cell lines derived from the bodies of aborted babies.

That's because under New York's Vaccine Mandate imposed on health care workers throughout the state, opportunities for religious exemptions have been explicitly stripped away— in direct violation of federal statutory and constitutional law. The utterly lawless character of this schematic is so obvious that even one of the most constitutionally lawless states in the Union as a matter of course—California—has a health care vaccine mandate with an *express religious exemption* (*see infra*).

Under the challenged Vaccine Mandate here, religious exemptions are forbidden but medical exemptions are available.  Physical health trumps spiritual health yet again in New York's endless COVID-19 regime, which has managed to survive even the official ending of the "state of disaster emergency" by the former Governor.  And yet, throughout the pandemic, these same plaintiffs have practiced their professions without need of vaccination, some of them contracting the virus themselves from patients they treated, only to recover and continue their work.  *See* Verified Complaint, ¶¶ 133, 151, 171, 181.

Never in the history of this country—indeed, never in the history of the world—has a government attempted to impose mass vaccination on an entire class of citizens under threat of loss of livelihood and professional standing.  But New York is attempting to do just that, sweeping aside the protection of sincere religious beliefs under Title VII and the Free Exercise Clause of the First Amendment, as well as the parallel protections under the New York Human Rights Law and the New York City Human Rights Law.

Months after ex-Governor Cuomo ended the "state of disaster emergency" and rescinded all his related executive orders, the defendants herein dare to continue exercising sweeping "emergency" powers based on nothing but their apparent conviction that they can do anything they please and get away with it, because no one will stop them.   But these plaintiffs respectfully submit that this Court must stop them—for the sake of representative government, the supremacy of federal remedial law over the discriminatory whims of state officials, and the very Constitution on which this nation was founded. (For remaining background, Plaintiffs incorporate by reference the allegations of the Verified Complaint filed contemporaneously with this memorandum.)

## ARGUMENT

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Chestnut Hill NY, Inc. v. City of Kingston*, No. 117-cv-0095, 2017 WL 11418271, at *1 (N.D.N.Y. Feb. 22, 2017). To obtain a preliminary injunction, a plaintiff must establish: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) that the balance of hardships "tips in the plaintiff's favor"; and (4)

that the injunction is not adverse to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotations omitted). Plaintiffs easily satisfy all four factors here.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE VACCINE MANDATE PLAINLY VIOLATES FEDERAL LAW

### A.   The Vaccine Mandate Is Clearly Preempted by Title VII Federal Employment Law.

The merits of this case are as simple as they appear at first glance. New York—which, despite what some of its bureaucrats might believe, is no higher in the Republic's hierarchical constitutional scheme than any other state—has imposed a COVID-19 vaccine mandate on health care employees that *forbids* exactly what federal law *requires*. Specifically, the New York Public Health and Health Planning Council's ( "Health Council's") August 26, 2021, COVID-19 vaccine mandate for health care workers ("Vaccine Mandate") conspicuously *eliminates* (and thereby forbids) any opportunity for covered employees to even *attempt* to secure a reasonable accommodation for their sincerely held religious objections to the currently available COVID-19 vaccines. This flies in the face of Title VII of the Civil Rights Act of 1964, which *requires* employers with more than 15 employees—including all of Plaintiffs' employers here—to reasonably accommodate their employees' sincere religious beliefs and practices, *unless* (and only unless), a specific employer can show that any accommodation would specifically impose an undue hardship on that employer. But in a move straight out of a pre-18th century playbook (specifically, pre-1787), New York's blanket rule outright forbids health care workers from following federal law and seeking an accommodation for their sincere religious objections to the available COVID-19 vaccines. Such antiquated sovereign hubris violates one of the key principles to emerge from the Framers' Constitutional Convention during that fateful summer in

Philadelphia: only *federal* law (not federal law plus elitist New York bureaucrats' "emergency" rules) is the supreme law of the land. The Vaccine Mandate plainly contravenes it here.

"Federalism, *central to the constitutional deign*, adopts the principle that both the National and State Governments have elements of sovereignty that the other is bound to respect." *Arizona v. U.S.*, 567 U.S. 387, 398 (2012) (emphasis added). "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Id*. at 399 (quoting U.S. Const. Art. VI, cl. 2).

Thus, the Supreme Court "has long made clear that federal law is as much the law of the several States as are the laws passed by their legislatures." *Haywood v. Drown*, 556 U.S. 729, 734 (2009). And indeed, "under the Supremacy Clause . . . any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, *must yield*." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (emphasis added); *see also Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) ("If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law," and "[l]awsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur"), *cert denied*, 140 S. Ct. 2508 (2020); *see also Chicago & N.W. Transp. Co. v. Kalo Brick Tile Co.*, 450 U.S. 311, 317 (1981) ("[T]he Supremacy Clause invalidates state laws that interfere with or are contrary to the laws of [C]ongress.").

Here, the Vaccine Mandate directly interferes with each of the Plaintiffs' *federal-law* rights under Title VII. That's because Title VII makes it unlawful for covered employers to, among other things, "discharge . . . or otherwise discriminate against any individual" in his or her

employment "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). It also makes it unlawful for such employers "to limit, segregate, or classify" an employee "in any way which would . . . tend to deprive" an individual of "employment opportunities," or which would "otherwise adversely affect" an individual's status as an employee "because of such individual's . . . religion." *Id.* § 2000e-2(a)(2).

Critically, "religion" is defined to mean "all aspects of religious observance and practice, as well as belief, *unless* an employer *demonstrates* that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship" on "the employer's business." *Id.* § 2000e(j). In practice, this means Title VII prohibits an employer from discriminating against an employee "in order to avoid accommodating a religious practice that it could accommodate without an undue hardship." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015); *see also id.* ("An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions."). Moreover, this rule applies even to employers' *neutral* policies that *incidentally* burden people of faith. *See id.* at 775 ("An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter," but Title VII gives religious practices "favored treatment" and "requires otherwise neutral policies to give way to the need for an accommodation").

Thus, under federal law, all of Plaintiffs' employers are required to accommodate Plaintiffs' religious objections to the available COVID-19 vaccines *unless* (and only unless) those employers can *demonstrate* that doing so would be an undue hardship on their businesses. Yet, almost unbelievably, the Vaccine Mandate outright forbids all Plaintiffs here from even seeking (or retaining already granted) reasonable accommodations from COVID-19 vaccination in accord with their sincerely held religious beliefs, which categorically prevent all of them from

receiving the vaccines now available, all of which are connected to abortion in their testing, development or manufacture. The Vaccine Mandate *forbids* each of their employers *from even considering* requests for religious exemptions notwithstanding the contrary *requirements* of Title VII.  Indeed, Plaintiffs have either sought or inquired about obtaining a religious exemption from the COVID-19 vaccine mandate from their respective employers, and some were even granted religious exemptions that were revoked after the Vaccine Mandate went into effect. (See Complaint at ¶¶ 49, 77, 142, 161, 172) Every plaintiff has thus been denied his or her federally protected right to employer accommodation of sincerely held religious beliefs solely because of the Vaccine Mandate.

Indeed, a mandate of this type is even expressly preempted by Title VII, which explicitly provides that "[n]othing in this subchapter shall be deemed to exempt or relieve any person from any . . . law of any State . . . *other than* any such law which purports to *require . . . any act which would be an unlawful employment practice* under this subchapter." 42 U.S.C. § 2000e-7 (emphasis added). Here the Vaccine Mandate purports to require categorical denials of requests for religious exemptions from the state's COVID-19 vaccine mandate, while Title VII *forbids* employers from refusing to accommodate an employee's sincere religious beliefs and practices unless the employer can actually demonstrate that doing so would be an undue hardship.

The Vaccine Mandate is thus both effectively and expressly preempted by federal law. As such, it must *yield* to Plaintiffs' federal-law rights under Title VII to seek religious exemptions from the Mandate. That is the simple but clear demand of our Constitution's Supremacy Clause.[1]

---

[1] To be clear, Plaintiffs do not argue the Supremacy Clause provides them an implied right of action. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, (2015) (holding "that the Supremacy Clause does not confer a right of action"). Rather, they seek "to enjoin unlawful executive action" under this Court's equitable powers. *Id.* at 327-28; *see also Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 642 (2002) (holding that federal courts

**B.      The Vaccine Mandate Also Violates the Free Exercise Clause of the First Amendment.**

**1.      The Vaccine is not a neutral and generally applicable burden on religious exercise.**

The Vaccine Mandate plainly burdens Plaintiffs' exercise of religion. Yet the Mandate is quintessentially *non*-neutral and *non*-generally applicable, and it cannot satisfy strict scrutiny. Indeed, the Mandate's recent history confirms that it *targets* religion by specifically *eliminating* the religious exemption in the prior Health Order, enacted only days before.  *See* Complaint, ¶¶ 2, 20. And it is not generally applicable at least because it authorizes *medical* exemptions that, on the Mandate's own premise, make health care workers and their patients more vulnerable to contracting the COVID-19 Delta variant. These exemptions (and the examples of other states, which have no such mandates) show that New York has no compelling interest in denying a religious exemption to these Plaintiffs, and the Mandate is not the *least restrictive means* of furthering New York's stated interest.

A regulation is not a neutral burden on religion if it discriminates against a religious practice on its face, or if in its real operation it targets a religious practice. *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health and Mental Hygiene*, 763 F.3d 183, 193, 194-95 (2d Cir. 2014). "[T]he specific series of events leading to the enactment or official policy in question" is relevant in detecting lack of neutrality. *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012). Additionally, a regulation is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) (emphasis in original). And

---

have subject matter jurisdiction to consider lawsuits on the basis that a state "regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail") (internal quotations omitted).

"whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," including activities that "*could . . . present[] similar risks*" of "spread[ing] COVID-19." *Id.* (emphasis added) (internal quotations omitted).

Here, the specific events leading to the Vaccine Mandate's final version show that it effectively targets religious opposition to the available COVID-19 vaccines. In particular, Defendant Zucker's prior Health Order specifically authorized both medical *and religious* exemptions from the Vaccine Mandate. (Cmplt., Ex. B, Order at Sec. (a).) Specifically, the Health Order stated that "[c]overed entities *shall grant a religious exemption*" from the COVID-19 vaccine requirement for covered personnel who "hold genuine and sincere religious belief contrary to the practice of immunization, subject to a reasonable accommodation by the employer." (Id.)[2] The Order was signed by Defendant Zucker on August 18th. But just eight days later, on August 26th, the PHHPC promulgated a formal amended rule that conspicuously *eliminated* any exemptions from the Vaccine Mandate on religious grounds, while retaining the availability of exemptions on medical grounds. (Cmplt., Ex. A, at 2.61(d).) Thus, notwithstanding the aforementioned clear requirements of federal employment law regarding religious accommodations, the Mandate's final version was specifically "gerrymandered with care to proscribe religious [objections]" while maintaining authorization for medical exemptions. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993); *see also id.*

---

[2] It's not immediately clear whether the Order authorized exemptions only for those opposed to *all* vaccinations on religious grounds, although such a limitation would have clearly run afoul of the Constitution to the extent it excluded those who are religiously opposed the available COVID-19 vaccines while not necessarily opposing all vaccines generally. *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable logical, consistent or comprehensible to others in order to merit First Amendment protection.").

534 ("The Free Exercise Clause protects against government hostility which is masked, as well as overt," and courts "must survey meticulously the circumstances of government categories to eliminate, as it were, religious gerrymanders").

In sum, the Mandate flagrantly disallows the religious protections required by federal employment law and specifically deletes its own prior offering of religious exemptions for covered health care workers. Given these circumstances, the Mandate clearly targets religious conduct for disfavored treatment and cannot be deemed a neutral burden on Plaintiffs' religious exercise. It therefore triggers strict scrutiny, which it fails for reasons discussed below.

Moreover, the Vaccine Mandate is not generally applicable because it is blatantly underinclusive as to its purposes. The Mandate states that its provisions are necessary in light of "a concerning national trend of increasing circulation of the SARS-CoV-2 Delta variant," and unvaccinated health care personnel "have an unacceptably high risk of both acquiring COVID-19 and transmitting the virus to colleagues and/or vulnerable patients or residents." (Cmplt., Ex. A, at 2.61 "Needs and Benefits".) But the Mandate expressly *accepts* this risk for those in need of a "[m]edical exemption," which is authorized for covered personnel for whom "immunization with [a] COVID-19 vaccine is detriment to [their] health," which is undefined, at least "until such immunization is found no longer to be detrimental to such personnel member's health." (Id. at 2.61(d)(1).) It's obvious that medical personnel who are exempt from the vaccine mandate for "health" reasons "*could* . . . present[] similar risks" of "spread[ing] COVID-19" as those with religious objections to the vaccine. *Tandon*, 141 S. Ct. at 1296 (emphasis added) (internal quotations omitted). And there is no reason of science or logic that mitigating accommodations provided for the former group should be categorically unavailable for the latter. Therefore, the Mandate plainly treats "comparable secular activity" (i.e., the practice of health care while

9

unvaccinated for medical reasons) "more favorably than religious exercise" (i.e., the practice of healthcare while unvaccinated for religious reasons). *Id*. That is exactly the kind of unequal treatment of religion that triggers strict scrutiny,[3] which, again, the Mandate cannot satisfy.

### 2.    The Vaccine Mandate easily fails strict scrutiny.

To survive strict scrutiny, the Vaccine Mandate must, first of all, "advance[] interests of the highest order and [b]e narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2001) (internal quotations omitted).

Further, "[i]t is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 2234. And the asserted compelling interest cannot be stated at an unduly "high level of generality," but rather must be a compelling interest "in denying an exception" to "*particular* religious claimants." *Fulton*, 141 S. Ct. at 1882 (emphasis added).

Finally, narrow tailoring for purposes of strict scrutiny requires "showing that [the challenged rule] is the *least restrictive means*" of achieving a compelling interest. *Thomas v. Review Bd. of Indiana Emp. Security Div.*, 450 U.S. 707, 718 (1981) (emphasis added). The Vaccine Mandate fails both prongs here.

---

[3] The Mandate is also substantially underinclusive to the extent it applies only to *health care* "personnel" employed or affiliated with health care-related "covered entities," despite the Mandate's own acknowledgement that the health care industry is only *one kind of setting* where people are especially vulnerable to COVID-19. (See Cmplt., Ex. A, Am. Rule, at "Needs and Benefits" ("*Certain* settings, *such as* healthcare facilities and congregate care settings, pose increased challenges and urgency for controlling the spread of this disease because of the vulnerable patient and resident populations that they serve." (emphasis added)). The relatively narrow scope of the Mandate despite the purportedly broad national problem of increasing spread of the COVID-19 Delta variant is further evidence of the Mandate's substantial underinclusivity.)

First, there is no compelling interest in denying a religious exemption for these 17 Plaintiffs, who are spread out across multiple different health care facilities in New York, when the Vaccine Mandate allows the same institutions to grant medical exemptions notwithstanding the government's supposed interest in stopping the spread of the Delta variant. The Defendants can offer "no compelling reason why it has a particular interest in denying an exception [to these particular Plaintiffs] while making them available to others." *Fulton*, 141 S. Ct. at 1882; *see also id*. (holding that City of Philadelphia's authorization of secular exemptions from a non-discrimination rule "undermines the City's contention that its non-discrimination policies can brook no departures"). As the Supreme Court put it earlier this year with respect  to the government's "interest in reducing the spread of COVID," "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is *more dangerous* than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297.  That's exactly what the government cannot do here, given that health-care work while unvaccinated is permitted for *medical* reasons but not religious reasons.

Moreover, all of the Plaintiffs engaged in their work as medical professionals throughout the pandemic *without need of vaccination*. Yet now the State implausibly claims a dire threat to vaccinated health care workers if the Plaintiffs, who were never vaccinated before, are not vaccinated now.  What good, then, is the vaccination of the vaccinated?  And if patients, whether vaccinated or not, were treated by the Plaintiffs without danger to their health before, where is the danger now?  Any asserted "compelling interest" here is merely rhetorical, not actual.

Additionally, Defendants cannot satisfy the narrow-tailoring test that "the government must show that it seriously undertook to address the problem with less intrusive tools readily available to it," and that the government "must *demonstrate* that alternative measures imposing

11

lesser burdens on religious liberty would fail to achieve [its] interests."*Agudath Israel v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (emphasis added). Here the Health Council stated that it considered two "Alternative Approaches": (1) requiring covered entities to "test all personnel in their facility before each shift" (but it found this to have little benefit and unreasonable costs), and (2) mandating all personnel to wear "fit-tested N95 face coverings at all times when in the facility" (but it found that fit-tested 95 coverings are not the only kind of "acceptable face coverings" that have been "a long-standing requirement in these covered entities" and that these traditional face-coverings merely help *reduce*, but "do[] not prevent transmission.") (Cmplt., Ex. A, at "Alternative Approaches.")

Those assertions are utterly self-defeating, as it is impossible not to see that the government has failed to satisfy its high burden here. There is an abundance of widely accepted evidence that COVID-19 vaccines *likewise do not prevent* the transmission of COVID-19 and its variants. (Cmplt., Exs. E and F (Statement of CDC Director Dr. Rochelle Walensky that "what [COVID] vaccines can't do anymore is prevent transmission").) And daily testing is hardly the *only* other theoretical alternative to full-fledged vaccination. Indeed, the government provides no explanation for why any alternative (and presumably COVID-protective) accommodations made for employees with medical exemptions could not be made for these Plaintiffs with religious exemptions.  And, once again, if the precautions Plaintiffs took at the height of the pandemic and throughout its duration were good enough before vaccines became available, why are they not good enough now?

Finally, this Court should ensure the government gave "sufficient weight to rules in other jurisdictions" before concluding that the government's particularized interest is truly narrowly tailored. *See Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J.,

concurring and noting that the fact governments in other states allow for water-disposal alternatives of the kind sought by Amish plaintiffs in Minnesota undermined Minnesota's refusal to provide an accommodation there); *see also id.* ("It is the government's burden to show this alternative won't work; not the Amish's to show it will.").  Here, Plaintiffs are aware of only one other state (Maine) in the entire country that similarly strips health care workers of their federal statutory and constitutional right to seek a religious exemption from a Vaccine Mandate. *See* 10-144 C.M.R. Ch. 264 (2021) and 22 M.R.S. § 802(4-B) (Maine). Indeed, even otherwise similar mandates imposed on health care workers in two of our country's most politically liberal states specifically authorize religious exemptions. *See* Illinois EO 2021-20 (COVID-19 EO No. 87) (Aug. 26, 2021) at Sec. 2(e) (*requiring* exemption where "vaccination is medically contraindicated" or where it "would require the individual to violate or forgo a sincerely held religious belief, practice, or observance"), available at https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-20.2021.html; California, State Public Health Officer Order of August 5, 2021, Sec. 2 ("Workers may be exempt . . . upon . . . [signing] a declination form . . . stating . . . the worker is declining vaccination based on Religious Beliefs"), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx.  New York cannot show why similar alternatives cannot work for Plaintiffs here.

For the same reasons, Defendants cannot establish that refusing these Plaintiffs even the *opportunity* to seek religious exemptions and corresponding reasonable accommodations from the Mandate is the *least restrictive means* of furthering the government's patently non-

compelling interest. Thus, the Mandate easily fails strict scrutiny under both prongs and thereby violates the Free Exercise Clause.

**C.**     **The Vaccine Mandate Also Violates the Equal Protection Clause**

A government classification that burdens a fundamental right is subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Hayden v. Paterson*, 594 F.3d 150, 169-70 (2d Cir. 2010). Additionally, government classifications must have at least a rational basis in furtherance of a legitimate interest. *Kwong v. Bloomberg*, 723 F.3d 160, 170 (2d Cir. 2013). Once again, the government fails both prongs here.

For the reasons explained above, the government's classification flagrantly burdens Plaintiffs' right to the free exercise of religion and easily fails strict scrutiny, thereby violating the Equal Protection Clause in addition to the Free Exercise Clause.

Additionally, all of the Plaintiffs are similarly situated to the class of health care professionals who are allowed to seek accommodation under the Vaccine Mandate for reasons of "health," and yet Plaintiffs are treated differently without any rational basis. That's because Plaintiffs, like those with "health" reasons, are *also* unable to receive the vaccines (for religious reasons). Plaintiffs with religious reasons for exemption are no more unsuited to being reasonably accommodated. There is no rational, legitimate, or compelling interest in the Vaccine Mandate's application of different standards to similarly situated groups in the field of healthcare. *See Romer v. Evans*, 517 U.S. 620, 633 (1996) ("A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek [protection] from the government is itself a denial of equal protection of the laws in the most literal sense.")

Moreover, as noted above, Nurse J, Nurse N, Dr. P, and Dr. S have all previously had COVID or COVID-like symptoms and, on information and belief, all have natural immunity at a

greater level than the immunity purportedly available from the COVID-19 vaccines. (Cmplt., Exs. E and F.) Therefore it is utterly irrational to require these Plaintiffs to obtain the vaccine.

In sum, Plaintiffs are entitled to relief under the Equal Protection Clause as well.

For all of the reasons set forth above, Plaintiffs are plainly likely to succeed on the merits. And they also satisfy the remaining factors for a preliminary injunction, as set forth below.

## II. PLAINTIFFS SATISFY THE REMAINING FACTORS FOR A TRO AND PI

Plaintiffs easily satisfy the remaining three factors for an emergency TRO and PI: (1) irreparable harm; (2) balance of harms; and (3) public interest.

First, the Vaccine Mandate poses immediate and actual irreparable injury to Plaintiffs. They must all receive COVID-19 vaccinations by September 27 or October 7 or else be terminated from employment, causing untold damage to their licensure and credentialed status, without any opportunity to seek religious exemptions and corresponding reasonable accommodations from their employers. As is oft-stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Further, prohibiting Plaintiffs from practicing medicine and health care in accord with their sincerely held religious beliefs, on the same terms and conditions as those for whom the COVID-19 vaccines are medically contraindicated, in violation of Title VII federal law, "assuredly inflicts irreparable harm." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (holding as much with respect to Kentucky's order closing down houses of worship to stop the spread of COVID-19 while authorizing the continued operation of many secular businesses). Here, Plaintiffs must either receive the vaccine *in a matter of days* in direct violation of their religious beliefs, or remain faithful to those beliefs and face *imminent loss of employment, hospital admitting privileges anywhere in the State of New York, and severe damage to their*

15

*professional standing, including likely disciplinary consequences, as the Complaint alleges concerning each Plaintiff.* That Hobson's choice is a direct result of the Vaccine Mandate and plainly constitutes irreparable harm.

Second, as to the balance of harms, the likelihood of irreparable harm to Plaintiffs from the failure to grant them interim relief clearly outweighs the likelihood of any harm to Defendants from granting such relief.  The Vaccine Mandate definitely and absolutely imposes imminent irreparable harm on each of the Plaintiffs, and Defendants cannot show that enjoining that Mandate will cause them any real harm. The Vaccine Mandate already allows health care workers an exemption for reasons of "health," presumably with reasonable accommodations, and there is no evidence those accommodations will undermine the government's asserted purposes at issue. Defendants cannot show that granting the same accommodations to Plaintiffs for religious reasons would impose any more harm—especially when Plaintiffs have been on the front lines of stopping COVID for the past 18 months while donning PPE and exercising other proper protocols in effectively slowing the spread of the disease before the emergence of the Delta variant this summer. They merely seek an injunction that "appropriately permits religious [conduct] with the same risk-minimizing precautions as similar activities" allowed of health care workers with medical exemptions to the vaccine. *Roberts*, 958 F.3d at 416. Thus, the balance of harms weighs heavily in favor of Plaintiffs.

Finally, as to public interest, "treatment of similarly situated [health care providers] in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Id*. And "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Thus, for the reasons

already explained, a TRO and injunction enjoining the Vaccine is directly in service of the public interest.

## III.  PLAINTIFFS SATISFY THE STANDARD FOR PROCEEDING UNDER PSEUDONYMS

Although F.R.C.P. Rule 10(a) generally requires the title of the Complaint to name all parties, the Second Circuit recognizes plaintiffs' rights to proceed pseudonymously when their interest in anonymity outweighs "the public's interest in disclosure and any prejudice to the defendant." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008). The Second Circuit has adopted a non-exclusive multi-factor balancing test to resolve this question, *see id.*, 537 F.3d at 190, and Plaintiffs easily meet at least the following factors:

- The litigation involves matters that are "highly sensitive and of a personal nature" because Plaintiffs would otherwise be disclosing to the entire public their personal medical information, including vaccination status, breastfeeding, intended pregnancy, COVID-infection and recovery, in a climate especially hostile to those who are forgoing the COVID vaccines (see below).

- Identification poses a substantial "risk of retaliatory physical or mental harm" to Plaintiffs given the explicit death threats and "terrorist" labels being hurled at those who are forgoing the vaccines. (*See*, e.g., Cmplt., Ex. C (online commentator stating about those attending a vaccine-mandate protest: "The anti-vaxers are ignorant trash and don't deserve to live. Gun them down while they're all in one place and let God sort it out.")).

- Plaintiffs are "particularly vulnerable" to these possible consequences because of the top-down cultural, societal, and legal assault currently underway against those who forgo the vaccines. Nowhere is this more apparent than in the speech by President Biden on September 9, 2021, wherein the nation's Chief Executive brings down opprobrium on the

17

heads of Americans who decline vaccination:  "We've been patient, *but our patience is wearing thin*, and the refusal *has cost all of us*...." (emphasis added)  Absent anonymity, Plaintiffs would be identified as members of the public who, according to the sitting leader of the free world, are "cost[ing] all of us."[4]

- Plaintiffs are challenging the validity of government, not private, activity and would be admitting to designs to otherwise engage in prohibited conduct in a context where that conduct is being demonized by virtually every organ of mainstream public opinion, comedians, talks show hosts, and the President himself. *See*, *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979).

- The defendants are not prejudiced by allowing Plaintiffs to sue anonymously, and "there is an atypically weak public interest in knowing the litigants' identities," because this case involves "purely legal" issues focusing almost exclusively on whether the Vaccine Mandate disrupts the fundamental project of our Founding Fathers by flipping the Supremacy Clause on its head and taking a sledge hammer to the Free Exercise Clause.

In light of these factors, this Court should grant Plaintiffs leave to proceed anonymously.


## IV.     IN THE EVENT THESE MOTIONS ARE DENIED, PLAINTIFFS SHOULD BE GRANTED AN INJUNCTION PENDING APPEAL.

The standard for obtaining an injunction pending appeal under Fed. R. App. P. Rule 8(a) (requiring that Plaintiffs first move for this relief in District Court) is essentially the same as that for obtaining a preliminary injunction. It requires this Court to consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

---

[4] Remarks by President Biden on Fighting the COVID-19 Pandemic, WhiteHouse.gov, Sep. 9, 2021, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

applicant will be irreparably harmed absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 1987).

For the same reasons articulated above (*supra*, Sections I & II), Plaintiffs easily satisfy all four factors and are entitled to an injunction pending appeal should their motions for a TRO and PI be denied.  If the requested injunctive relief is denied, Plaintiffs respectfully request an order denying an IPA as well in order to avoid unnecessary further motion practice.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs motions to temporarily restrain and preliminary enjoin the Vaccine Mandate and grant Plaintiffs leave to proceed anonymously.  Alternatively, if the requested injunctive relief is not granted, Plaintiffs respectfully request an injunction pending appeal or, failing that, an order denying same.

Respectfully submitted,

September 13, 2021

_____
MICHAEL G. MCHALE, ESQ.
(Bar No. 701887)
Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
Telephone: 402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

_____
CHRISTOPHER A. FERRARA, ESQ.
 (Bar No. 51198)
 Special Counsel
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
 *Counsel for Plaintiffs*

Peter Breen
Vice President and Senior Counsel
THOMAS MORE SOCIETY
309 W. Washington, Ste. 1250
Chicago, IL 60606
(312) 782-1680
pbreen@thomasmoresociety.org
*Counsel for Plaintiffs*
*Pro hac vice* motion pending

Stephen M. Crampton
Senior Counsel
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
662-255-9438
scrampton@thomasmoresociety.org
*Counsel for Plaintiffs*
*Pro hac vice* motion pending