**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Dr. A., NURSE A., DR. C., NURSE D., DR. F., DR. I., THERAPIST I., NURSE J., DR. M., NURSE M., NURSE N., DR. O., DR. P., DR. S., NURSE S.** and **PHYSICIAN LIAISON X.**, <br><br> Plaintiffs, <br><br> v. <br><br> **KATHY HOCHUL**, Governor of the State of New York, in her official capacity; **HOWARD A. ZUCKER**, Commissioner of the New York State Department of Health, in his official capacity; and **LETITIA JAMES**, Attorney General of the State of New York, in her official capacity, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No. 1:21-cv-1009 (DNH) (ML) <br><br>    **Memorandum of Law** |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RENEWED MOTION
FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS …………………………………………………………………i

TABLE OF AUTHORITIES …………………………………………………………...ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 5

   I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................... 5

     A.   The CMS Mandate Directly Conflicts With Rule 2.61................................................ 5

        1.   The CMS Mandate Plainly Requires Religious "*Exemptions*" for Personnel Within the Scope of the Rule. ................................................................................ 6

        2.   The CMS Mandate's Provision for Religious *Exemptions* Directly Conflicts with Rule 2.61's "Bar" on Religious Exemptions. ......................................................... 9

        3.   Title VII itself is now preemptive under *Chevron* Deference................................ 14

     B.   The CMS Mandate Now Occupies the Field Over Rule 2.61...................................... 14

        1.   The Dual Purpose and Scope of the CMS Mandate and Rule 2.61. ....................... 15

        2.   The CMS Mandate is so pervasive as to occupy the field and preempt Rule 2.61 at covered facilities. ................................................................................... 17

     C.   New York's Denial of Unemployment Benefits Violates the Free Exercise Clause.... 21

   II.   REMAINING FACTORS............................................................................................... 23

     A.   Irreparable Harm. ....................................................................................... 23

     B.   Public Interest and Balance Harms. ............................................................. 24

CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) …………………….14,20

*Armstrong v. Exceptional Child Center Inc.*, 575 U.S. 320 (2015) ………………………11,12,13

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015) ………………………..5

*Biden v. Missouri*, 142 S.Ct. 647 (2022) ……………………………………………… .passim

*Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786 (2011) …………………………………..22

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*,
     846 F.3d 392 (2d Cir. 2017) ……………………………………………………………..14

*Chestnut Hill NY, Inc. v. City of Kingston*, No. 117-cv-0095, 2017 WL 11418271
     (N.D.N.Y. Feb. 22, 2017) …………………………………………………………....……5

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ………………22

*Drake v. Lab. Corp. of America Holdings*, 458 F.3d 48 (2d Cir. 2006) …………………………..9

*Elrod v. Burns*, 427 U.S. 347 (1976) ……………………………………………………………23

*Employment Division v. Smith*, 494 U.S. 872 (1990). ………………………………………….22

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
     841 F.3d 133 (2d Cir. 2016) …………………………………………………………..23,24

*Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88 (1992) …………………………..……..17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
     546 U.S. 418 (2006) …………………………………………………………………….22

*Guardians Ass'n v. Civil Serv. Comm.*, 630 F.2d 79 (2d Cir. 1980) ……………………………10

*Hobbie v. Unemployment App. Comm'n of Florida*, 480 U.S. 136 (1987) ……………………..22

*Lankford v. Sherman*, 451 F.3d 496 (8th Cir. 2006) ……………………………………………13

*Louisiana v. Becerra*, No. 3:21-cv-03970, 2021 WL 5609846 (W.D. La. Nov. 30, 2021) ………1

*Mast v. Fillmore Cnty., Minnesota*, 141 S.Ct. 2430 (2021) ……………………………………..23

*McCullen v. Coakley*, 573 U.S. 494 (2014) …………………………………………………..23

*Missouri v. Biden*, No. 4:21-cv-01329-MTS, 2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) ……1

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ………………………24

*Nken v. Holder*, 556 U.S. 418 (2009) ……………………………………………………...24

*Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001) ……………………...19

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) ……………………………………………...24

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) …………………………25

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ……………………………………….13

*Sherbert v. Verner*, 374 U.S. 398 (1963) …………………………………………………21,22

*Steel Inst. of New York v. New York City*, 716 F.3d 31 (2d Cir. 2013) ………………………17,18

*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2508 (2020) ………………..11,18,20

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011) …………………………………………23

*U.S. v. State of N.Y.*, 708 F.2d 92 (2d Cir. 1983) …………………………………………………23

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635 (2002) …………….12

*Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ………………………….12

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. Nov. 4, 2021) ………………..*passim*

**Laws**

42 U.S.C. § 2000e ……………………………………………………………………*passim*

**Administrative Sources**

EEOC Compliance Manual on Religious Discrimination,
   https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination ......................7

86 Fed. Reg. 61555 (2021) ……………………………………………………………*passim*

42 C.F.R. § 482.42 …………………………………………………………..……..*passim*

10 N.Y.C.R.R. §2.61 …………………………………………………………………*passim*

The Safer Federal Workforce Task Force,
https://www.saferfederalworkforce.gov/downloads/RELIGIOUS%20REQUEST%20FORM_FINAL%20REVIEW_20211003%2010.29%2011am.pdf …………………………………………7


**Other Authorities**

Centers for Disease Control and Prevention, Interim Guidance for Managing Healthcare Personnel with SARS-CoV-2 Infection or Exposure to SARS-CoV-2, Jan. 21, 2022, https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html ………………4

Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines," Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6 …………………………4

Emergency Application, *Dr. A. et al. v. Hochul et al.*, No. 21A145, Nov. 12, 2021 …………….21

Adam Liptak, "Supreme Court Allows Vaccine Mandate for New York Health Care Workers," New York Times, Dec. 13, 2021, https://www.nytimes.com/2021/12/13/us/politics/supreme-court-vaccine-mandate-new-york-healthcare.html ………………………………………………………………………………3

National Employment Law Project, "These 4 States Pay Unemployment Benefits to Unvaccinated Workers Who Were Fired," Dec. 15, 2021, https://www.nelp.org/press-clips/these-4-states-pay-unemployment-benefits-to-unvaccinated-workers-who-were-fired/ ……………………………………………………………………..23

N.Y. State Dep't of Health, *Unemployment Insurance Top Frequently Asked Questions*, Sept. 25, 2021), Perma | Unemployment Insurance Top Frequently Asked Questions | Department of Labor ……………………………………………………………………………....21

N.Y. State Governor's Office, *In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage*, Sept. 25, 2021, Perma | In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage. ……………………………………………………………………………..2,21

New York State, *Governor Hochul Announces Direct Payments to Healthcare Workers as Part of $10 Billion Healthcare Plan*, Jan. 5, 2022, https://www.governor.ny.gov/news/governor-hochul-announces-direct-payments-healthcare-workers-part-10-billion-healthcare-plan ……………………………………………………………4

Transcript of Oral Argument, *Biden v. Missouri*, https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21a240_7648.pdf ..10

WION News, "'Omicron strain infecting vaccinated,' WHO issues warning on Covid-19 variant," Dec. 21, 2021, https://www.youtube.com/watch?v=iVPTdibFhN8 …………………………………..……………………………………………………………...…….25

## <u>INTRODUCTION</u>

Two weeks ago, in *Biden v. Missouri*, 142 S.Ct. 647 (2022), the U.S. Supreme Court resurrected President Biden's COVID-19 vaccine mandate from Medicare- and Medicaid-participating healthcare facilities (the "CMS Mandate") from injunctions imposed by two federal district courts in November 2021. *Louisiana v. Becerra*, No. 3:21-cv-03970, 2021 WL 5609846, at *17 (W.D. La. Nov. 30, 2021) (emphasis added); *see also Missouri v. Biden*, No. 4:21-cv-01329-MTS, 2021 WL 5564501, at *15 (E.D. Mo. Nov. 29, 2021).

But the Mandate—which was not before the Second Circuit—requires at least one major protection for healthcare workers warranting injunctive relief here, notwithstanding the Second Circuit's hurried vacatur of this Court's injunction on different legal grounds last fall. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. Nov. 4, 2021). As the Supreme Court expressly recognized in *Biden*, the CMS Mandate "requires providers to offer medical and **religious exemptions**." *Biden*, 142 S. Ct. at 651.[1] Under the CMS Mandate, covered staff "*must be able to request an **exemption** . . . based on applicable Federal law*," including "sincerely held **religious beliefs**…" pursuant to "Title VII…" 86 Fed. Reg. 61555, 61572 (2021).

The CMS Mandate's use of the term "religious **exemptions**" is crucial, given that the Second Circuit rejected Plaintiffs' Title VII preemption claim on the dubious grounds Title VII requires only the ability to seek "religious **accommodations**"—which somehow excludes "exemptions." *See We the Patriots*, 17 F.4th at 292. As New York's vaccine mandate—Rule 2.61—prohibits religious exemptions while allowing "medical **exemptions**," the direct conflict with federal law is now beyond dispute.

---

[1] Emphasis added. Unless otherwise indicated, all emphasis is added and all quotations from cited decisions are "cleaned up."

Interpreting Title VII without the wordplay employed by New York, the U.S. Department of Health and Human Services (HHS) concluded that "reasonable accommodations" of religion **are** religious "exemptions," just as plaintiffs have argued from the beginning. The HHS's interpretation of its own regulation binds plaintiffs' employers. Amend. Verif. Comp. ¶ 11.

Further, the CMS Mandate's vast sweep preempts the field of COVID-19 vaccination in covered healthcare facilities. Having filed a First Amended Verified Complaint of right, Plaintiffs seek a new preliminary injunction, based on both conflict and field preemption arising from the CMS mandate, that will allow them to seek reinstatement under a religious exemption.

Plaintiffs also seek injunctive relief from Governor Hochul's rule imposing a disqualification from unemployment benefits for those terminated for refusing COVID-19 vaccination, even if the refusal is grounded in religious belief.[2] This unprecedented punishment of religious recusants was imposed after this action was commenced.

The sixteen remaining Plaintiffs[3] continue to suffer irreparably from Rule 2.61's ruinous application—even as the Supreme Court declares that the CMS Mandate requires a process for seeking "religious *exemptions*" from COVID-19 vaccination.[4] Following this Court's TRO and preliminary injunction last fall, fourteen of the remaining sixteen Plaintiffs either obtained religious exemptions, had revoked exemptions restored, or were de facto exempted by being allowed continue working pending the final outcome of the original injunction proceedings. Am.

---

[2] N.Y. State Governor's Office, *In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage*, Sept. 25, 2021, Perma | In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage.

[3] Plaintiff "Technologist P.", who moved to Florida after her termination, has elected not to continue as a plaintiff.

[4] Notably, "[a]ll plaintiffs are or were employed by, or associated with for purposes of admitting privileges, hospitals or other entities that receive Medicare or Medicaid funding." Am. Verif. Comp. ¶12 .

Comp. ¶¶ 91, 102, 118, 137, 149, 158, 173, 188, 201, 216, 239, 257, 264-266, 279, 291.  Every one of those exemptions or de facto exemptions was revoked following the Second Circuit's decision in *We the Patriots*. Am. Comp., ¶¶ 91, 120, 138, 174, 189, 201, 239, 267, 280.

Under coercion, five Plaintiffs submitted to vaccination but now move for injunctive relief from the State's drearily predictable demand for a "booster" shot as condition of continued employment under Rule 2.61 as amended effective January 21, 2022.  Am. Comp. ¶¶ 112, 163, 242, 260, 283; *see* Exhibit A to Am. Comp.  Two Plaintiffs voluntarily resigned to avoid even more serious consequences.  Am. Comp. ¶¶ 190, 218.  The rest of the Plaintiffs have suffered disastrous consequences ranging from loss of employment anywhere in New York, to loss of a medical residency, to forfeiture or imminent forfeiture of partnership interests and future income because admitting privileges were revoked for failure to be vaccinated.  The Plaintiffs who were terminated or forced to resign reasonably fear actions against their licensure. Am. Comp. ¶¶ 96, 111, 130, 142, 166, 180, 191, 204, 218, 232, 246, 271.

Thus, all sixteen Plaintiffs need immediate relief in the form of an injunction (a) forbidding the State to enforce Rule 2.61 against their attempts to seek reinstatement to lost positions under the overriding religious exemption provisions of the CMS mandate, and (b) prohibiting enforcement of the Governor's unemployment benefits disqualification.

Meanwhile, it has become obvious that Rule 2.61 is a total debacle—perhaps the worst public policy blunder in New York's history. Having forced 37,000 healthcare workers out of their jobs for failure to be vaccinated,[5] Hochul has declared a statewide crisis in healthcare

_____

[5] Adam Liptak, "Supreme Court Allows Vaccine Mandate for New York Health Care Workers," New York Times, Dec. 13, 2021, (noting that "New York State estimates that about . . . 37,000 [healthcare] workers . . . have left their jobs as a result of [New York's] vaccine mandate"), https://www.nytimes.com/2021/12/13/us/politics/supreme-court-vaccine-mandate-new-york-healthcare.html.

staffing.[6]  This at the same time the data show that **COVID-19 vaccination does not prevent healthcare workers from contracting or transmitting the virus** (especially the now-dominant Omicron variant).[7]  **Supporting Decl. of Richard Scott French, M.D., ¶¶ 17-56.**   Yet the very title and **the only rationale** of Rule 2.61 is "**Prevention of COVID-19 transmission** by covered entities."[8]  (*See* Regulatory Impact Statement, "Needs and Benefits," at 10 ("[u]nvaccinated personnel . . . have an unacceptably high risk of both acquiring COVID-19 and transmitting the virus  .  .  .  ,  exacerbating  staffing  shortages,  and  causing  unacceptably  high  risk  of complications").[9]  Rule 2.61—a draconian measure eschewed by 47 states and now the federal government—has utterly defeated its own purpose.

To add to the absurdity of this outcome, the CDC now advises that **both unvaccinated and vaccinated healthcare workers <u>infected with COVID</u> can return to work:** five days after becoming  infected  if  the  employer  is  in  a  "contingency"  situation  and  the  worker  is asymptomatic or "mildly symptomatic," or **anytime, even without five-day quarantine and <u>even with symptoms</u>**, if there is a staffing "crisis" and asymptomatic and "mildly symptomatic" workers are prioritized.[10]  Am. Comp. ¶ 75, 107, 108.

Yet Governor Hochul presses on with her pointless vaccination crusade. Following this Court's preliminary injunction, she publicly condemned religious objectors for "not doing what

---

[6] New York State, *Governor Hochul Announces Direct Payments to Healthcare Workers as Part of $10 Billion Healthcare Plan*, Jan. 5, 2022, https://www.governor.ny.gov/news/governor-hochul-announces-direct-payments-healthcare-workers-part-10-billion-healthcare-plan.
[7] Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines," Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6.
[8] *See* https://regs.health.ny.gov/volume-title-10/content/section-261-prevention-covid-19-transmission-covered-entities.
[9] https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2021-08-26/docs/revised_proposed_regulation.pdf (last visited Jan. 26, 2022).
[10] https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html.

God wants" and failing to be "true believers" who will say "thank you, God" for the COVID vaccine "[t]hat is from God to us." She spoke at two church services, explaining: "[God] made them come up with a vaccine. That is from God to us and we must say, thank you, God." Inviting harassment of the ungodly unvaccinated, Hochul further declared: "[B]ut you know there's people out there **who aren't listening to God and what God wants**. **You know who they are**. I need you to be my apostles." As Hochul told another congregation: "How can you believe that God would give a vaccine that would cause you harm? … **And all of you, have to be not just the true believers, but our apostles to go out there and spread the word** that we can get out of this once and for all, if everybody gets vaccinated. Am. Comp., ¶¶ 46-48. Almost everybody *is* vaccinated, yet COVID-19 spreads everywhere among them.

## ARGUMENT

The standard for a preliminary injunction or TRO is: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) a balance of hardships that "tips in the plaintiff's favor"; and (4) an injunction is not adverse to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *Chestnut Hill NY, Inc. v. City of Kingston,* No. 117-cv-0095, 2017 WL 11418271, at *1 (N.D.N.Y. Feb. 22, 2017). Plaintiffs once again easily satisfy all four factors.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The CMS Mandate Directly Conflicts with Rule 2.61.

"[C]onflict preemption [is] where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of

federal objectives." *We the Patriots*, 17 F.4th at 291 n.31 (internal quotations omitted). That is, the CMS Mandate meets **the Second Circuit's own test** for conflict preemption.

Opining that Title VII requires only **accommodations** but not **exemptions**, the Second Circuit concluded that Rule 2.61 "bars an employer from granting a religious **exemption** from the vaccination requirement." *Id. at* 292 (emphasis in original). But, as noted above, the CMS Mandate requires precisely a process for considering "*exemption[s]* from COVID-19 vaccination requirements." including "religious beliefs" protected by Title VII.

The CMS Mandate was promulgated on November 5, 2021—the day after the Second Circuit's decision in *We the Patriots*. The Supreme Court upheld it on January 13, 2022, in a per curiam opinion that *twice* acknowledged the Mandate's guarantee of religious "**exemptions**." *Biden*, 142 S. Ct. 647, 650, 651. Leaving no doubt of the matter, the CMS Mandate also **expressly preempts** inconsistent state and local laws. 86 Fed. Reg. at 61568. Therefore, Rule 2.61 is preempted by the CMS Mandate and is a blatant violation of the Supremacy Clause. But even if the Mandate were not preemptive—and it is—under *Chevron* deference it is a binding agency interpretation that *Title VII* requires "religious **exemptions**" and is thus preemptive.

### 1. The CMS Mandate Plainly Requires Religious "*Exemptions*" for Personnel Within the Scope of the Rule.

The CMS Mandate "amend[s] the existing conditions of participation in Medicare and Medicaid to add a new requirement—that facilities ensure that their covered staff are vaccinated against COVID-19." *Biden*, 142 S. Ct. at 651 (citing 86 Fed. Reg. 61561, 61616—61627). Critically, "[t]he rule requires providers to offer medical and *religious exemptions*." *Id.* (emphasis added); *see also id. at* 650 (staff must be vaccinated "unless **exempt** for medical or **religious** reasons").

It is crucial to note that the CMS mandate requires consideration of religious exemptions for employees *within the scope of the rule* whereas, according to the Second Circuit, Rule 2.61 allows "accommodations" only for employees **outside** the scope of the rule. *See We the Patriots*, 17 F. 4th at 292.  As the CMS Mandate specifically provides:

> [W]e recognize that there are some individuals who might be eligible for exemptions from the COVID-19 vaccination requirements in this IFC under existing Federal law. Accordingly, we **require** that providers and suppliers included in this IFC establish and implement a process by which staff may request an **exemption** from COVID-19 vaccination requirements based on **applicable Federal law.**

*Id*. (emphasis added). The Mandate further states that "[c]ertain . . . **religious beliefs** . . . may provide grounds for **exemption**." *Id*. (emphasis added).

The CMS Mandate employs "accommodation" and "exemption" interchangeably, stating "Federal laws" like "Title VII of the Civil Rights Act of 1964" require "**accommodations** for some individual staff members" in some circumstances, and thus that "[r]equests for **exemptions** based on applicable Federal law must be documented and evaluated in accordance with applicable Federal law." *Id*. (emphasis added). Further: "[u]nder. . . Title VII of the Civil Rights Act of 1964 . . . workers who cannot be vaccinated or tested because of . . . **sincerely held religious beliefs,** practice, or observance may in some circumstances be granted **an exemption** from their employer." *Id*. (emphasis added). Also, employers must protect "employees from retaliation for requesting **an exemption on account of religious belief** or disability status." *Id*. (emphasis added).  Finally, for more information, the Mandate cites the EEOC's Compliance Manual on Religious Discrimination and "The Safer Federal Workforce Task Force's 'request

7

for a religious **exception** to the COVID-19 vaccination requirement'"—both of which refer to religious **accommodations** and **exemptions/exceptions** interchangeably.[11] *Id.* (emphasis added).

These "Vaccine Exemptions" requirements, *see* 86 Fed. Reg. at 61572, cover facilities that are subject to Medicaid and Medicare regulations generally, regardless of whether they already required COVID vaccination pursuant to their own policies or those of state or local law. *Id.* at 61616—61627. These facilities include ambulatory surgical centers, hospice care, facilities that provide "specific services" under Part 441 of 52 CFR chapter IV, programs of all-inclusive care for the elderly, hospitals, state health care facilities and long term care facilities, home health services, and "specialized providers" under Part 485. *Id.*; *see also, e.g., id. at* 61620 (amending § 482.42(g)(3)(i) to require vaccination for all staff "except for those staff who have pending requests, or who have been granted, **exemptions** to the vaccination requirements of this section")

Also pertinent here is that the Mandate's general vaccination requirement expressly does **not** apply to remote workers, and thus—unlike, and in conflict with, Rule 2.61—**exemption** process required by the Mandate applies only to *non*-remote workers who provide in-person medical services. *See, e.g.*, 86 Fed. Reg. at 61619 (§482.42(g)(2) ("The policies and procedures of this section **do not apply** to the following hospital staff: (i) … telehealth or telemedicine services **outside of the hospital setting** [without direct contact with patients and other staff," and "(ii) … support services… performed exclusively **outside of the hospital setting** …")).

Compare Rule 2.61, which the Second Circuit found to comply with Title VII because it allegedly provides "a reasonable accommodation that *removes*" some individuals "from the

---

[11]See https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination; https://www.saferfederalworkforce.gov/downloads/RELIGIOUS%20REQUEST%20FORM_FINAL%20REVIEW_20211003%2010.29%2011am.pdf.

scope of the rule." *We the Patriots*, 17 F.4th at 292; *see also id.* at 274 (vaccine requirement applies only to those covered by the Rule's definition of "personnel"—i.e., those "who engage in activities such that if they were infected with COVID-19, they could potentially expose other[s]"… to the disease'" (citing 10 N.Y.C.R.R. § 2.61(a)(2)).  As already noted, the CDC now advises that due to the widespread COVID infection of both vaccinated and unvaccinated health care professionals, both can return to work during a staffing crisis, even if "mildly symptomatic"—thus revealing the utter pointlessness of Rule 2.61 at this point.

**2.     The CMS Mandate's Provision for Religious *Exemptions* Directly Conflicts with Rule 2.61's "Bar" of Religious Exemptions.**

"[W]hether federal regulations preempt state law depends on whether the agency that prescribed the regulations meant to pre-empt [state] law, and, if so, whether that action is within the scope of the [agency's] delegated authority." *Drake v. Lab. Corp. of America Holdings*, 458 F.3d 48, 56 (2d Cir. 2006) The Supreme Court has answered the second question in *Biden*, holding that the "rule falls within the authorities that Congress has conferred upon" the Secretary of Health and Human Services. *Biden*, 142 S. Ct. at 652.

As to the first question, the CMS Mandate clearly intends to preempt conflicting state or local laws, including the availability of religious exemptions: "[C]onsistent **with the Supremacy Clause** of the United States Constitution," "[t]his nationwide regulation preempts inconsistent State and local laws as applied to Medicare- and Medicaid-certified providers," particularly given the agency's "understand[ing] that some states and localities have established laws that would seem to prevent Medicare- and Medicaid-certified providers and suppliers from complying with the requirements of this IFC." 86 Fed. Reg. 61568.

It's true the Mandate also intends to preempt any state or local laws that provide "broader grounds for exemptions than provided for by Federal law and are inconsistent with this IFC…"

*Id.* at 61613 (emphasis added); *see also id.* at 61572. But these provisions do not detract from the Mandate's plain commands that "[a]pplicable staff . . . **must** be able to request an exemption from these COVID-19 vaccination requirements based on applicable Federal law," including "Title VII," *id.* at 61572, and that "[r]equests for exemptions based on applicable Federal law"—including for "sincerely held religious beliefs"—**must** be documented and evaluated **i**n **accordance with applicable Federal law** and each facility's policies and procedures." *Id.* (emphasis added).[12] The Mandate clearly requires that covered employers establish a process for considering religious **exemptions**, preempting state or local laws that would bar exemptions.[13]

As mentioned, the Second Circuit held that Rule 2.61 "**bars** an employer from granting a religious **exemption**." *We the Patriots*, 17 F.4th at 292. It reiterated as much in its "clarifying opinion" eight days later, stating that "it may be possible under the Rule for an employer to accommodate—**not exempt**—employees with religious objections, by employing them in a manner that removes them from the Rule's definition of 'personnel.'" *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 368, 370 (2d Cir. Nov. 12, 2021) (emphasis in original). According to the Second Circuit, therefore, Rule 2.61 prohibits exactly what the CMS Mandate requires: consideration of religious exemption requests by employees *within the scope* of the CMS Mandate's vaccination requirement, who "*must* be able to request" religious "*exemptions*…" IFC,86 Fed. Reg. 61568, 61572. And, again, the CMS Mandate **does not apply to remote workers**. *See, e.g.*, 86 Fed. Reg. 61619 (§482.42(g)(2) & (3)).

---

[12] This preemption of unduly narrow exemption provisions is entirely sensible given that state or local laws are no defense to a federal Title VII claim. *See Guardians Ass'n v. Civil Serv. Comm.*, 630 F.2d 79, 104-05 (2d Cir. 1980).

[13] The Assistant U.S. Solicitor General confirmed as much at oral argument before the Supreme Court: "the Secretary required [covered] providers to make sure that their staff are vaccinated, **subject to medical and religious exemptions**." Transcript of Oral Argument, *Biden v. Missouri*, https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21a240_7648.pdf.

This disparity between federal and New York law is paradigmatic conflict preemption, given the impossibility of complying with both the CMS Mandate and Rule 2.61 at one and the same time, and the fact Rule 2.61 is a roadblock of the federally mandated religious exemption process. *See*, *We the Patriots*, 17 F.4th at 291 n.31.

Furthermore, there is no doubt Plaintiffs can proceed against Defendants in equity in this matter. *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) ("If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law," and "[l]awsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur."), *cert. denied*, 140 S. Ct. 2508 (2020). It's true that in *Armstrong v. Exceptional Child Center Inc.*, the Supreme Court clarified that the Supremacy Clause itself does not contain an implied private of action—and Plaintiffs do not argue otherwise here—and that even an action in equity cannot lie under 42 U.S.C. § 1396a(a)(30)(A) where plaintiffs sought enforcement of that provision's mandate that Idaho's Medicaid state plan for habilitation services provide appropriate reimbursement rates for providers. 575 U.S. 320, 323, 327-28 (2015). However, that second holding turned on two interlocking features of § 30(A) that "establish Congress's intent to foreclose equitable relief"— (1) "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary"; *and* (2) "the judicially unadministrable nature of § 30(A)'s text." *Id*. at 328. The Court noted that it "is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with the efficiency, economy, and quality of care,' all while 'safeguard[ing] against unnecessary utilization of . . . care and services'" – a "judgment-laden standard" conferred "upon the Secretary alone" to achieve interests such as expertise, uniformity,

11

and administrative guidance, thereby avoiding "inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." *Id*. at 328-29.

In contrast here, it is difficult to imagine a *less* broad and *more* specific requirement than the CMS Mandate's command that covered staff "**must** be able to request an **exemption**" under "Title VII." 86 Fed. Reg. 61572. While the CMS Mandate is a Medicare and Medicaid regulation and thus remediable by the Secretary's withholding of federal funds, this feature does not "*by itself* preclude the availability of equitable relief," *Armstrong*, 575 U.S. at 328; *see also Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 n.3 (2011) (That Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has displayed an intent *not* to provide the more complete and immediate relief that would otherwise be available under *Ex Parte Young*"). That's especially true here, where the CMS Mandate's "Vaccine Exemption" requirement is so easily judicially administrable.

Further, the CMS Mandate exhibits no intent to foreclose equitable jurisdiction. *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642, 647 (2002) (observing that even if the statutory text at issue "does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law," and the statute at issue was not a "limited" and "detailed remedial scheme" demonstrating "any intent to foreclose jurisdiction under *Ex Parte Young*").

Here, the CMS Mandate provides only general enforcement language stating that providers cited for noncompliance "*may* be subject to enforcement remedies imposed by CMS depending on the level of noncompliance…" 86 Fed. Reg. 6157. Nothing in the Mandate *limits*

the remedies available in a judicial action. *Cf. Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74-75 (1996) (no equitable jurisdiction where "intricate" enforcement provision *limited* judicial remedies to directing the State to negotiate, requiring mediation, or ordering Secretary of Interior to be notified). Indeed, the Mandate's provision for religious exemptions **expressly incorporates the protections of Title VII**, *see* 86 Fed. Reg. at 61572, which in turn expressly authorizes (generally after E.E.O.C. review) judicial injunctions to enforce the individual protections conferred thereunder. *See* 42 U.S.C. § 2000e-5(g)(1).

Thus, Plaintiffs' action is well within this Court's equitable jurisdiction. *See, e.g., Lankford v. Sherman*, 451 F.3d 496, 509-513 (8th Cir. 2006) (plaintiffs likely to succeed on preemption claim that Missouri's refusal to reimburse for equipment qualifying under the Medicaid Act violated the Supremacy Clause, because "once the state voluntarily accepts the conditions imposed by Congress, the Supremacy Clause obliges it to comply with federal requirements").[14]   Nothing in the CMS Mandate *divests* courts of authority under 28 U.S.C. § 1331 to review whether New York's Rule 2.61 complies with federal law, and its provision that "[a]pplicable staff of the providers and suppliers included in this IFC **must** be able to request an **exemption** from these COVID-19 vaccination requirements based on applicable Federal law," including "Title VII of the Civil Rights Act of 1964," is quintessentially judicially administrable.

In sum, Plaintiffs are likely to prevail on the merits that the CMS Mandate's command for the availability of religious "exemptions" is in direct conflict with, and thus preempts, Rule 2.61's "bar[]" on "employer[s] from granting a religious *exemption*" from COVID-19 vaccination. *We the Patriots USA*, 17 F.4th at 292 (emphasis in original).

---

[14] Notably, **Plaintiffs do not assert that the Medicaid Act itself creates a private right of action, nor that a preemption claim arises here under § 1983**. Thus, they need not show they have been "unambiguously conferred" a private right of action. *See Armstrong*, 575 U.S. at 331-32, and second *.

### 3.     Title VII itself is now preemptive under *Chevron* Deference.

Even if the CMS Mandate itself were not preemptive (which it is), this Court should hold that the Mandate's interpretation of Title VII is controlling under the doctrine of *Chevron* deference, and thus that Title VII itself (under the CMS interpretation) preempts Rule 2.61.

Given the divergence of constructions applied by the Second Circuit and CMS on the meaning of Title VII "reasonable accommodations," the statutory text is at least "ambiguous" under *Chevron* "Step One." *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 392, 507 (2d Cir. 2017). And under *Chevron* "Step Two," the agency's view is clearly "based on a permissible construction of the statute*," id.*, if only because it ensures religious accommodations are given at least equal status with medical exemptions pursuant to Title VII's guarantee of *favored* treatment for religion in the workplace. In other words, it is plainly "not arbitrary, capricious, or manifestly contrary to the statute." *Id.*

Further, because it is supported by a reasoned explanation—"federal law" requires it— and because it is "reasonable policy choice for the agency to make"—to require compliance with federal law *and* avoid hemorrhaging of healthcare staff, which the Mandate expressly sought to ameliorate—this Court should "accord deference to the agency's interpretation," *id.*, and thus alternatively hold that under CMS's interpretation, **Title VII itself** newly preempts Rule 2.61.

### B.     The CMS Mandate Occupies the Field over Rule 2.61.

Field preemption exists when "the pervasiveness of the federal regulation precludes supplementation by the States, [or] where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of the obligations imposed by it . . . reveal the same purpose." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220-21 (2d Cir. 2008). The CMS Mandate clearly occupies the field of COVID-19 vaccination requirements in healthcare facilities and preempts Rule 2.61.

1.      **The Dual Purpose and Scope of the CMS Mandate and Rule 2.61.**

As the Supreme Court recently explained, the CMS Mandate is a sweeping rule "amending the existing conditions of participation in Medicare and Medicaid" across the country, newly requiring "that facilities ensure that their covered staff are vaccinated against COVID-19." *Biden*, 142 S.Ct. at 651. As the 73-page Mandate itself puts it:

> CMS believes that the developing data about staff vaccination rates and rates of COVID-19 cases, *and the urgent need to address COVID-related staffing shortages that are disrupting patient access to care*, provides strong justification as to the need to issue this IFC requiring staff vaccination for most provider and supplier types over which we have authority.

86 Fed. Reg. at 61567 (emphasis added).

The Mandate applies to a vast array of healthcare facilities across the country, including "hospitals, nursing homes, ambulatory surgical centers, hospices, rehabilitation facilities, and more." *Biden*, 142 S.Ct. at 650; *see also* 86 Fed. Reg. at 61656, and 61616-61627. The mandate applies to all covered facility staff of any kind to the extent they "provide any care, treatment, or other services to the facility and/or its residents." *See, e.g.*, 86 Fed. Reg. at 61619 (§ 482.42(g)(1)(i)-(iii) (hospitals)). And, again, the Mandate **excludes remote workers**. *See, e.g., id*. at § 482.42(g)(2). And as already discussed, the Mandate requires that covered staff within its vast sweep be availed the opportunity to seek religious **exemptions**.

The Supreme Court upheld the Mandate as "fit[ting] neatly within" the Secretary's express Congressional authority to impose Medicaid- and Medicare-conditions deemed "necessary in the interest of the health and safety of individuals who are furnished such services." *Biden*, 142 S. Ct. at 652 (quoting 42 U.S.C. § 1395x(e)(9)). The Court noted it is the "longstanding practice of Health and Human Services" to require Medicaid- and Medicare-participating facilities "to satisfy a host of conditions that address the safe and effective provision

of healthcare," including the implementation of programs to govern the "surveillance, prevention, and control of … infectious diseases." *Id.* at 652-53 (quoting 42 C.F.R. § 482.42). The Secretary of HHS also "routinely imposes" requirements on the "qualifications and duties of healthcare workers themselves," and thus "the Secretary's role in administering Medicare and Medicaid goes *far beyond* that of a mere bookkeeper." *Id.* at 653 (emphasis added).

The Court flatly rejected Justice Thomas's dissenting, four-vote view that "[v]accine mandates [] fall squarely within a State's police power, and, until now, only rarely have been a tool of the Federal Government." *Id.* at 658 (Thomas, J., dissenting). The majority instead found that "Justice THOMAS offer[s]" an unduly "narrower view of the various authorities at issue," and that "there can be no doubt that addressing infection problems in Medicare and Medicaid facilities is what [the Secretary] does." *Id.* at 653.

In comparison, New York's Rule 2.61 (as amended and renewed on January 21, 2022), also requires COVID-19 vaccination at healthcare facilities across New York. It was likewise promulgated because of the DOH's finding that COVID-19 vaccination would help prevent the transmission of COVID-19 and also help prevent healthcare workers themselves from being infected with the virus and thus "exacerbating staffing shortages, and causing unacceptably high risk of complications." *We the Patriots*, 17 F.4th at 274 (quoting *Dr. A.* Sp. App'x at 39). And Rule 2.61 specifically provides that "covered facilities" includes a list that substantially overlaps those covered by the CMS Mandate. 10 N.Y.C.R.R. § 2.61(a)(1)(i)-(iv); *cf.* 86 Fed. Reg. at 61616-61627. Rule 2.61 also defines covered "personnel" in a manner similar manner to the CMS Mandate:  persons "employed or affiliated with" a covered facility, "whether paid or unpaid," including contract staff, students, and volunteers—but only to the extent "they could

16

potentially expose other covered personnel, patients or residents to the disease." 10 N.Y.C.R.R. §
2.61(a)(2); *cf.* 86 Fed. Reg. at 61616 (§ 416.51(c)(1)-(2)).

Thus, like the CMS Mandate, Rule 2.61 does not apply to assignments such as
"telemedicine" "where [staff] would not pose a risk of infection to other personnel, patients, or
residents." *We the Patriots*, 17 F.4th at 292. Yet, as to exemptions, Rule 2.61 provides only for
"[m]edical exemptions," but *not* religious exemptions. 10 N.Y.C.R.R. § 2.61(d)(1).

### 2. The CMS Mandate is so pervasive as to occupy the field and preempt Rule 2.61 at covered facilities.

Although "there is a strong presumption against preemption when states . . . exercise their
police powers to protect the health and safety of their citizens," the Supreme Court and the
Second Circuit have recognized that a state's exercise of these powers is still preempted "if the
federal scheme is so pervasive as to displace any state regulation in that field." *Steel Inst. of New
York v. New York City*, 716 F.3d 31, 36 (2d Cir. 2013) (cleaned up).

For example, in *Gade v. National Solid Wastes Management Association*, the Supreme
Court held that OSHA's regulation of hazardous waste operations in the workplace preempted
Illinois laws regulating similar hazardous workplace operations. *See Gade v. Nat'l Solid Waste
Mgmt. Ass'n*, 505 U.S. 88, 92-93 (1992). Both regulatory schemes required comparable amounts
of training in hazardous waste materials operations for workers and supervisors exposed to
hazardous waste in the workplace, but with Illinois adding a much more onerous requirement for
obtaining hazardous-waste crane-operator's licenses. *Id.* at 93. The Court held that the design of
the OSH Act—including a provision authorizing the submission of state plans "to preempt
applicable Federal standards"—showed a Congressional intent "to subject employees to only one
set of regulations, be it federal or state. *Id.* at 99. It further held that even though the Illinois rules
constituted "dual impact laws" for the benefit of both workers and public safety, they had the

effect of "directly, substantially, and **specifically** regulat[ing] occupational safety and health" and thus were an "occupational safety and health standard" preempted by the OSH Act and its regulations. *Id.* at 104-108. The Court distinguished "state laws of general applicability . . . that regulate the conduct of workers and nonworkers alike," but noted that Illinois's laws were **not** of general applicability because they—**like the OSHA regulations**—were "directed at workplace safety." *Id.* at 107. Importantly, the Supreme Court noted that OSHA's authority to establish mandatory workplace safety and health standards "**brought the Federal Government into a field that traditionally had been occupied by the States**." *Id.* at 96.

In light of *Gade*, the Second Circuit recently held that New York City regulations on the use of cranes, derricks, and hoisting equipment "regulate the same things" as OSHA regulations and thus "constitute 'regulation of an occupational safety or health issue with respect to which a federal standard has been established'"—meaning "the City's regulations **are preempted** unless they are saved from preemption as laws of general applicability." *Steel Inst. of New York*, 716 F.3d at 38 (emphasis added). The Second Circuit found the City's regulations are generally applicable because "[b]y their terms they apply to the conduct of workers and nonworkers alike," and "are **not** directed at safety in the workplace" but rather "apply all over the City, not just in workplaces or construction sites." *Id.* at 38.

Even more recently, the Second Circuit held that the FAAct preempted Connecticut's "Runway Statute" limiting runway length at Tweed-New Haven Airport because the federal act sought "to create a uniform and exclusive system of federal regulation in the field of air safety," and to "centralize" the power to craft air safety rules. *Tweed-New Haven Airport Authority*, 930 F.3d at 74. The Court reasoned that the state law had a "direct impact on air safety," because its restriction on runway length at the Tweed-New Haven Airport "has a direct bearing on"

permissible "weight load and passenger capacity" and also the types of planes that can safely use the airport. *Id*. Further, "[t]he **inflexibility of the ban** imposed by the Runway Statute also counsels in favor of preemption" as its "restriction on runway development is absolute," was a "total barrier to improvements that **could make Tweed safer** and more modern." *Id.*

Under these cases, the CMS Mandate plainly occupies the field of mandatory COVID-19 vaccination in the covered facilities. Although Medicaid "utilizes cooperative federalism . . . in the pursuit of common purposes" with the States and thereby typically renders preemption "less persuasive," *Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), the CMS Mandate expressly seeks to **correct and centralize** "an inconsistent patchwork of requirements and laws" across states and localities, which "undermines the efficacy of COVID-19 vaccine mandates by encouraging unvaccinated workers to seek employment at providers that do not have such patient protections, exacerbating staffing shortages" and causing disparities in available care. 86 Fed. Reg. at 61566, 61584. Thus, even if Rule 2.61 is an exercise of New York's police powers, the CMS Mandate brings "the Federal Government into a field that traditionally ha[s] been occupied by the States," *Gade*, 505 U.S. at 96, in order to harmonize divergent policies and practices in this once-in-a-lifetime pandemic. *See Biden*, 142 S.Ct. at 653 (HHS Secretary "has never had to address an infection problem of this scale and scope before").

The Mandate is also pervasive—regulating all manner of staffers inside facilities, and all "[i]ndividuals who provide care, treatment, or other services for the" facility or its "patients, under contract or by other arrangement," to the degree they any have direct or indirect patient contact. *See, e.g.*, 86 Fed. Reg. at 61616 (§ 416.51(c)(1)&(2). There are also detailed implementation processes for ensuring (and documenting) compliance with facilities' vaccination and exemption obligations. *See id.*, at 61616 (§ 416.51(c)(1)-(3)). Further, Rule 2.61

19

is not a rule of general applicability but regulates the same scope of healthcare workers at substantially the same types of facilities. *See* 10 N.Y.C.R.R. § 2.61(a)(1) & (2).

Additionally, "the inflexibility of" the "bar" on "religious **exemptions**" under Rule 2.61 "counsels in favor of preemption," *Tweed-New Haven Airport*, 930 F.3d at 74, as it undermines the CMS Mandate's twin purpose of reducing "COVID-related staffing shortages that are disrupting patient access to care." 86 Fed. Reg. at 61567. The Mandate's exemption process requirements allow facilities to balance the costs and benefits of retaining unvaccinated staff, particularly if other vaccinated staff are contracting COVID (including Omicron) and thus putting additional strain on the health care system. And, again, the CDC guidance now advises that **both vaccinated and unvaccinated workers can return to work** even if only "mildly symptomatic" to address a staffing crisis.

In short, the federal law and medical facts emerging since the Second Circuit's decision have rendered pointless and indeed counterproductive Rule 2.61's "absolute" bar on religious exemptions and its "total barrier" religious "exemptions" that "could make [healthcare facilities] safer and more modern," *Tweed-New Haven Airport*, 930 F.3d at 74, as COVID and its newly emerging variants infect the vaccinated and unvaccinated alike. There was no sound reason to force 37,000 health care workers out of their jobs when federal law allowed for their religious exemption.[15]

Accordingly, the CMS Mandate's "interest in the field" of COVID-19 vaccine mandates for healthcare workers at covered facilities "is sufficiently dominant," and its "object . . . and the character of the obligations imposed by it . . . reveal the same purpose" as Rule 2.61. *See Air Transp. Ass'n of Am., Inc.*, 520 F.3d at 220-21. The Mandate is preemptive for this separate and

---

[15] *See* note 5, *supra*.

independent reason. Thus, Plaintiffs are likely to succeed on their claim that Rule 2.61's bar on religious exemptions is preempted by the CMS Mandate.

### C.   New York's Denial of Unemployment Benefits Violates the Free Exercise Clause.

The Supreme Court has held that denying unemployment benefits because one's "religious beliefs" did not amount to "good cause" for refusing work triggers strict scrutiny and violates the Free Exercise Clause. *Sherbert v. Verner*, 374 U.S. 398, 401, 403-04 (1963).

Here, New York's rule forbidding unemployment benefits to those terminated for refusing COVID-19 vaccination is such a denial, as it presumes that religious reasons are not good cause for refusing to work on condition of vaccination.[16] While *other* workers will have their applications "reviewed on a case-by-case basis," healthcare workers who "are terminated for refusing an employer-mandated vaccination will be ineligible."[17] The only exception is for terminated employees who seek a "*medical* accommodation."[18]

In short, Plaintiffs are categorically "ineligible" for refusing vaccination **because** of their religious beliefs.[19]   And, for precisely that reason, plaintiff Nurse N.'s application for unemployment benefits has been held up since last October while the Department of Education examines the "reasons" for her termination—meaning her religiously motivated refusal to be

---

[16] New York's gerrymandered unemployment benefits rule did not issue until September 25, 2021—nearly two weeks after this Court's entrance of a TRO for Plaintiffs on September 14, 2021—and Plaintiffs merely cited the rule as evidence of Rule 2.61's overall lack of religious neutrality in their emergency petition to the Supreme Court last fall. *See* Emergency Application, *Dr. A. et al. v. Hochul et al.*, No. 21A145, Nov. 12, 2021, Br. at 23-24.

[17] N.Y. State Dep't of Health, *Unemployment Insurance Top Frequently Asked Questions*, Sept. 25, 2021), Perma | Unemployment Insurance Top Frequently Asked Questions | Department of Labor.

[18] N.Y. State Governor's Office, *In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage*, Sept. 25, 2021, Perma | In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage.

[19] *Supra*, n.6.

vaccinated.  Am. Comp., ¶¶ 230-231. The DOE's interference in the application—as the agency that oversees Nurse N's licensure—portends its denial on grounds of religion.

In *Employment Division v. Smith*, the Supreme Court observed that it had previously applied strict scrutiny to invalidate unemployment compensation rules three times: in *Sherbert*, *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981), and *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136 (1987). *See* 494 U.S. 872, 883-4 (1990). *Smith* preserved these unemployment benefits cases as "stand[ing] for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 884; *see Hobbie*, 484 U.S. at 186. But that is exactly what New York has done here: religious objectors are categorically ineligible for unemployment benefits. Under *Sherbert*, *Thomas* and *Hobbie* the the denial of unemployment benefits violates the Free Exercise Clause.

The unemployment benefit qualification cannot survive strict scrutiny. There is no interest "of the highest order" in denying unemployment compensation to religious recusants from vaccination unemployment benefits. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429-30 (2006). Nor is this "actually necessary to the solution," *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011), as it is a post-hoc punishment for refusing vaccination after one has already been terminated from healthcare work.

Further, those denied *medical* exemptions are eligible for unemployment benefits. Thus Rule 2.61 "cannot be regarded as protecting an interest of the highest order [because] it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). Nor is the rule a permissible "least restrictive means." At least four states have passed laws clarifying that workers who lose their

22

jobs for failing to comply with workplace COVID-19 vaccine mandates will qualify for unemployment benefits.[20] New York has failed to "show[] that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 494, 495 (2014); *see also Mast v. Fillmore Cnty., Minnesota*, 141 S.Ct. 2430, 2433 (2021) (Gorsuch, J., concurring). New York's gratuitous and vindictive punishment of religious recusants from vaccination could not be more plainly violative of the First Amendment.

## II.    REMAINING FACTORS.

### A.    Irreparable Harm.

"[A]n alleged constitutional infringement will often alone constitute irreparable harm. *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011). This includes violations of the Supremacy Clause according to the Second Circuit itself. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 155 (2d Cir. 2016) ("Because plaintiffs are thus likely to succeed on their preemption claim, they are entitled to a preliminary injunction."); *see also U.S. v. State of N.Y.*, 708 F.2d 92 (2d Cir. 1983) (irreparable harm on preemption claim). And, of course, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As Plaintiffs are likely to succeed on the merits of both their preemption and First Amendment claims, they have unquestionably suffered irreparable harm.

Additionally, the Plaintiffs' monetary losses on account of termination or suspension of admitting privileges cannot be remedied by money damages, as employers would arguably be protected by Rule 2.61 and the State is immune to damages under the Eleventh Amendment. *See State of N.Y.*, 708 F.2d at 94 (irreparable harm exists where plaintiff's "federal damages against

---

[20] National Employment Law Project, "These 4 States Pay Unemployment Benefits to Unvaccinated Workers Who Were Fired," Dec. 15, 2021, https://www.nelp.org/press-clips/these-4-states-pay-unemployment-benefits-to-unvaccinated-workers-who-were-fired/.

New York are constitutionally foreclosed" under the Eleventh Amendment); *see also We the Patriots*, 17 F.4th at 295 (acknowledging issue of irreparable harm as employers "might make a persuasive argument" they are not liable because Rule 2.61 forced their hands, while "sovereign immunity would likely prevent Plaintiffs from obtaining money damages from the State").

      **B.**    **Public Interest and Balance Harms.**

      The balance-of-harms and public-interest factors merge where, as here, the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Second Circuit has previously ruled that preliminary injunctions on laws preempted under the Supremacy Clause are in the public interest and outweigh any hardships that would accrue to the government. *See Friends of the E. Hampton Airport, Inc.*, 841 F.3d at 155. Additionally, it is axiomatic that "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

      Plaintiffs seek an injunction that "appropriately permits"—but does **require**—"religious [conduct] with the same risk-minimizing precautions as similar activities." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). They also seek an injunctive prohibition of Governor's vindictive denial of unemployment benefits. Indeed, given New York's crisis in healthcare staffing[21]—a crisis **caused**, **not ameliorated** by Rule 2.61—an injunction allowing Plaintiffs to seek religious reinstatement under a religious exemption would be in accord with both the CMS Mandate and the new CDC guidance discussed above. **As multiple plaintiffs attest, despite Rule 2.61, per the CDC "fully vaccinated" yet COVID-infected workers <u>are</u> returning to work at the very facilities from which plaintiffs were barred by Rule 2.61 <u>even though they were not infected</u>.** Am. Comp. ¶¶ 107-108, 128, 228. The public interest hardly favors continuing Hochul's farce.

---

[21] *See supra*, n.5.

Further, Defendants have not shown that allowing Plaintiffs to get the jobs back under a religious exemption—indeed, under the CDC's new guidance *allowing their return*—would impose any hardship. Rule 2.61 accomplished no legitimate purpose in punishing religious recusants as COVID is widely infecting vaccinated healthcare workers. Rule 2.61 is obsolete.[22] *See* **French. Decl., ¶¶ 17-56.**

Finally, Defendants cannot show that the Plaintiffs who received or were restored religious exemptions following this Court's TRO and preliminary injunction caused additional spread of COVID-19. *Cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 68 (2020) ("[T]he State has not claimed that attendance at the applicants' services has resulted in the spread of the disease."). Nor have they shown that the less restrictive means employed by 47 other states have worsened COVID spread. *See id.*

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Renewed Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: January 30, 2022

---

[22] *See, e.g.*, WION News, "'Omicron strain infecting vaccinated,' WHO issues warning on Covid-19 variant," Dec. 21, 2021, https://www.youtube.com/watch?v=iVPTdibFhN8.

Respectfully submitted,

/s/ Christopher Ferrara
CHRISTOPHER A. FERRARA, ESQ.
(Bar No. 51198)
Special Counsel
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael McHale
MICHAEL G. MCHALE
(Bar No. 701887)
Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Stephen M. Crampton
Senior Counsel
THOMAS MORE SOCIETY
309 W. Washington, S
Chicago, IL 60606
(312) 782-1680
scrampton@thomasmoresociety.org
*Counsel for Plaintiffs*